# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
File No.: 5:18-CR-01-FL-1

| | |
|---|---|
| UNITED STATES OF AMERICA, | &#124; |
| | &#124; MEMORANDUM OF LAW |
| vs. | &#124; IN SUPPORT OF DEFENDANT'S |
| | &#124; PRO SE MOTION FOR |
| RENEE CHRISTINE BORUNDA | &#124; COMPASSIONATE RELEASE |
| _____ | &#124; |

RENEE CHRISTINE BORUNDA, by and through counsel, submits the following Memorandum to aid the Court in deciding her *pro se* Motion for Compassionate Release under 18 U.S.C. § 3582(c)(1)(A) that she filed on 28 September 2020 (DE 56).

Jurisdiction

The district court's authority to grant compassionate release or a sentence reduction is found at 18 U.S.C. § 3582(c).  A defendant may qualify for a modification in her sentence due to certain age, health, or family circumstance factors.  18 U.S.C. § 3582(c)(1)(A).  Before the passage of the First Step Act on 21 December 2018 (see Pub. L. 115-391, 132 Stat. 5194), the discretion to file a motion for compassionate release under § 3582(c)(l)(A) rested entirely with the Director of the Bureau of Prisons (BOP).  After 21 December 2018, Section 603 of the First Step Act amended 18 U.S.C. § 3582(c)(l)(A) to provide that a

defendant may request compassionate release from the sentencing court after exhausting her administrative remedies within the prison. Compassionate release may be available to defendants where (1) extraordinary and compelling circumstances warrant a reduction in the sentence or (2) a defendant who is serving a sentence imposed pursuant to 18 U.S.C. § 3559(c) is at least seventy years old and has served at least thirty years in prison. 18 U.S.C. § 3582(c)(l)(A)(i)-(ii). Ms. Borunda is moving under the first category: extraordinary and compelling circumstances.

A reduction under either section must be consistent with applicable policy statements issued by the United States Sentencing Commission. *Id*. at (c)(l)(A). When reducing a term of imprisonment via compassionate release, a court "may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment[.]" *Id*.

The commentary to § 1B1.13 of the United States Sentencing Commission's advisory Guidelines Manuel provides criteria for determining whether extraordinary and compelling circumstances exist. U.S.S.G. § 1B1.13, comment. n.1. These criteria generally concern the age, medical condition, or family circumstances of the defendant. *Id*. However, this section of the Guidelines has not been updated to reflect the changes of the First Step Act and

it likely will not be updated anytime soon. *See United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *2, n.3 (D. Utah Feb. 18, 2020) (noting that the Sentencing Commission currently has an insufficient number of appointed commissioners). Nonetheless, the now-outdated U.S.S.G. §1B1.13 policy statement "does not constrain" a court's "independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." *Id* at **4-5 (internal citation omitted).

In addition to considering whether extraordinary and compelling circumstances are present, a court must further consider the 18 U.S.C. § 3553(a) factors and determine whether the defendant is a danger to the safety of another person or the community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § lBl.13.

In sum, Ms. Borunda must show (1) exhaustion of administrative remedies, (2) the existence of extraordinary and compelling circumstances, and (3) justification under the 18 U.S.C. § 3553(a) sentencing factors.

Background

Ms. Borunda was named in a two-count criminal information filed on 2 January 2018 charging conspiracy to commit health care fraud and aggravated identity theft (DE 29 p 3). On 13 March 2018, she waived indictment and pled

guilty to both counts pursuant to a plea agreement (DE 29 p 3).  On 7 November 2018, the Court sentenced her to 37 months in prison and three years of supervised release (DE 49 pp 2-3).  The Court authorized her to self-surrender to custody on 12 February 2019 (DE 54).  She filed her motion for compassionate release on 28 September 2020 (DE 56).

Exhaustion of Administrative Remedies

A defendant must have "exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(l)(A).  Other district courts have dismissed compassionate release motions for failure to exhaust administrative remedies.  *See, e.g., United States v. Safford*, No. 1:17-CR-00193, 2020 U.S. Dist. LEXIS 98352 at *4-5 (S.D.W.V. June 4, 2020).  They often do so based on the need to first ascertain the BOP's expertise on the matter.  *See id* ("removing the BOP's expertise is unwise").  On the other hand, some district courts have found the requirement to be waivable in light of the COVID-19 pandemic.  *See e.g.*, *United States v. Ferebee*, No. 2:10-CR-4-BO-1, at p 3 (E.D.N.C. Jul. 29, 2020) ("Given the exigencies created by COVID-19, the Court finds that exhaustion would be both futile and potentially subject

defendant to undue prejudice. The Court therefore concludes that § 3582(c)'s exhaustion requirement is appropriately waived.").

On 11 August 2020, Ms. Borunda submitted a request for compassionate release to her prison warden (DE 56-8 p 2). On 13 August 2020, the warden denied her request (DE 56-8 p 2). The letter denying her request noted that she had a right to appeal the decision but it does not appear she has done so. In her pro se compassionate release motion, she wrote that she had submitted a request for compassionate release to her warden and that 30 days had elapsed since she had done so (DE 56 p 41). It appears she may have misunderstood the exhaustion of administrative remedies requirement. Nonetheless, given the urgency of her serious health conditions and her exposure to COVID-19, she submits it would be futile to do so at this point. She respectfully asks the Court to find that she has exhausted her administrative remedies or waive the exhaustion of administrative remedies requirement and find that her motion for compassionate release is now properly before the Court.

Extraordinary and Compelling Circumstances

The Guidelines provide four categories of circumstances that are extraordinary and compelling. The first concerns the medical condition of the defendant (section A). The second concerns the age of the defendant (section

B).  The third concerns the family circumstances of the defendant (section C).
The fourth is a catchall provision, which permits the BOP Director to identify
other extraordinary circumstances that are not set out by the Guidelines (section
D).  U.S.S.G. § lBl.13, comment. n.1 (A)-(D).

Ms. Borunda is moving under the fourth category.  She submits that her
exposure to the current COVID-19 pandemic that is ravaging our federal prison
system coupled with her underlying medical conditions equates to compelling
and extraordinary circumstances.  The Centers for Disease Control and
Prevention (CDC) has identified ten underlying medical conditions (risk
factors) that put SARS-Cov-2/COVID-19 positive people at an increased risk of
severe illness or death.  *See* www.cdc.gov/coronavirus/2019-ncov/need-extra-
precautions/people-with-medical-conditions.html?CDC_AA_refVal=https
%3A%2F%2Fwww.cdc.gov %2Fcoronavirus%2F2019-ncov%2Fneed-extra-
precautions%2Fgroups-at-higher-risk.html (last visited 26 October 2020).
These risk factors include obesity, which is defined as a body mass index (BMI)
of 30 kilograms per meter squared or higher.  *Id*.


Exposure to COVID-19

Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2), also
known as the "novel coronavirus," is a strain of coronavirus that causes a viral

pneumonia known as coronavirus disease 2019 (COVID-19), the respiratory illness responsible for the current COVID-19 pandemic. *See* https://en.wikipedia.org/wiki/Severe_acute_respiratory_syndrome_coronavirus _2. The World Health Organization declared the outbreak a pandemic on 11 March 2020. *Id*. As described by the United States National Institutes of Health, it is the successor to SARS-CoV-1, the strain that caused the 2002– 2004 SARS outbreak. SARS-CoV-2 is contagious in humans. *Id*. The virus primarily spreads between people through close contact and via respiratory droplets produced from coughs or sneezes. *Id*.

What makes SARS-Cov-2 particularly dangerous is that it is highly contagious and no one appears to be immune from it. "One of the novel coronavirus's biggest advantages is how easily it spreads from human to human. [. . ..] Even before symptoms develop, infected people can spread this virus by speaking, singing, coughing and breathing out virus-laden droplets in close proximity to others. [. . ..] [E]veryone in the world is likely susceptible to it[.]" *See* https://www.npr.org/ sections/goatsandsoda/2020/07/29/888957450/ why-the-novel-coronavirus-has-the-power-to-launch-a-pandemic. Epidemiological studies estimate that each infection results in 1.4 to 3.9 new infections when no members of the community are immune and no preventive measures are taken. *See* https://en.wikipedia.org/wiki/Severe_acute_

respiratory_syndrome_coronavirus_2.  This infection rate may be higher in densely populated conditions.  *Id*.  By comparison, SARS-Cov-1 had an infection rate of between 0.19 and 1.08.  *See* https://en.wikipedia.org/wiki/ Basic_reproduction_number.

COVID-19 has also proven to be deadly.  The current mortality rate in the United States is estimated to be 68.84 deaths per 100,000 people.  *See* https://coronavirus.jhu.edu/data/mortality (last visited 26 October 2020). COVID-19 has infected more than 8.6 million people and killed more than 225,000 people in the United States alone.  *Id*.  While the mortality rate does not seem particularly high, the fact that COVID-19 is so contagious will still result in large numbers of people becoming infected and, in turn, dying from the disease.  By all accounts, the COVID-19 pandemic has overwhelmed the United States of America.  One federal district court described it thusly:  "COVID-19 has paralyzed the entire world.  The disease has spread exponentially, shutting down schools, jobs, professional sports seasons, and life as we know it." *United States v. Rodriguez*, No. 2:03-cr-00271-AB-1, 2020 US Dist LEXIS 58718, at *1 (E.D. Pa. Apr. 1, 2020).

COVID-19 is also ravaging America's federal prison system.  *See* www.bop.gov/coronavirus.  The BOP has over 125,000 inmates and approximately 36,000 staff members.  *Id*.  Currently, 2,000 inmates and 863

staff members are positive for COVID-19. *Id* (as of 26 October 2020). Nearly 15,000 inmates and more than 1,300 staff members have recovered from it. *Id*. One hundred and twenty-eight (128) inmates and two staff members have died from it. *Id*.

Ms. Borunda is currently housed at the Alderson Federal Prison Camp (FPC) in Alderson, West Virginia. *See* https://www.bop.gov/ inmateloc/. Alderson FPC has over 540 female inmates. https://www.bop.gov/locations/ institutions/ ald/. As of 26 October 2020, three inmates had confirmed COVID-19 test results. *See* www.bop.gov/coronavirus. However, in her 30 September 2020 pro se compassionate release motion, Ms. Borunda attached letters from two fellow inmates indicating that they had developed COVID-19-like symptoms but yet FPC Alderson refused to test them for COVID-19 (DE 56-6). Thus, the COVID-19 numbers shown for FPC Alderson on the official BOP website may be underestimates of the current COVID-19 prevalence at that facility.

The CDC has found that many conditions of detention create a heightened risk of infection to detainees—including insufficient space to quarantine, highly congregational or shared environments, insufficient on-site medical staff, frequent coming and going of staff members, and limited ability of prisoners to exercise effective disease prevention measures such as social

distancing and frequent hand washing. *See* Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention at www.cdc.gov/ coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited 10 June 2020); *Basank v. Decker*, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) ("[t]he risk of contracting COVID-19 in tightly-confined spaces, especially jails [and prisons], is now exceedingly obvious.")

In her pro se compassionate release motion, Ms. Borunda wrote that her housing unit was a large open area with doorless cubicles with dividing walls that failed to reach the ceiling (DE 56 p 5). The cubicles contained bunk beds that are spaced closer than six feet apart (DE 56 p 5). Inmates share everything, including bathroom facilities, telephones, televisions, and computers (DE 56 p 5). Inmates stand elbow to elbow at sinks and telephones (DE 56 p 5). FPC Alderson staff members have made no effort to create greater distances between inmates (DE 56 p 5). There is an insufficient amount of disinfectant supplies to sterilize sinks, toilets, phones, computers, et cetera after each use (DE 56 p 6). Inmates are also required to share bars of soap to wash their hands; they have not been supplied with hand sanitizer (DE 56 p 6). Ms. Borunda's fellow inmates corroborate this description in their letters (DE 56-6). Given that FPC

Alderson has cases of COVID-19, it is reasonable to believe that Ms. Borunda's description is accurate. Given the conditions at FPC Alderson, Ms. Borunda is unable to self-care due to an inability to protect herself from a COVID-19 infection, which could lead to severe illness or even death given her comorbidities.

Further, Alderson, West Virginia is located in Greenbrier and Monroe counties. *See* https://en.wikipedia.org/wiki/Alderson,_West_Virginia. In June 2020, the Greenbrier County Church suffered an outbreak of 17 cases of COVID-19. *See* https://dhhr.wv.gov/News/2020/Pages/COVID-19-Outbreak-Confirmed-in-Greenbrier-County-Church.aspx. It is likely that staff members from FPC Alderson are leaving the prison, going into the community, getting exposed to COVID-19, and then bringing the disease back to the prison to expose inmates that are unable to protect themselves. This is yet another example of Ms. Borunda's increased risk during the COVID-19 pandemic.

<u>Risk Factors</u>

Ms. Borunda is now 38 years old (DE 29 p 2). At the time she was sentenced, her presentence report (PSR) indicated she was five feet, six inches tall and weighed 280 pounds (DE 29 p 2). According to the CDC's online BMI calculator, that gave her a BMI of 45.19. *See* https://www.cdc.gov/widgets/

healthyliving/index.html#bmicalculator. Her recent prison medical records indicate that her weight was 242 pounds on 2 March 2020 (Exh A pp 6-7). Thus, her BMI has dropped to 39.06. Still, the CDC website indicates that a BMI of 30 or higher is one of the ten risk factors that place someone at an increased risk of severe illness or death with COVID-19 exposure. In fact, the CDC posts on its website that obesity may triple the risk of hospitalization due to a COVID-19 infection. *See* https://www.cdc.gov/obesity/data/obesity-and-covid-19.html. The CDC notes that obesity decreases lung capacity and reserve, which makes ventilation more difficult. *Id*. With increased obesity comes an increased risk of death. *Id*. Thus, Ms. Borunda is at an increased risk of death due to her obesity, which is borderline severe.

In her pro se compassionate release motion, Ms. Borunda cited a number of other cases holding that obesity amounts to extraordinary and compelling circumstances (DE 56 pp 20-21). Other courts are in agreement that obesity can support a conclusion as to the existence of extraordinary and compelling circumstances. *United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020); *United States v. Barber*, 6:18-cr-00446-AA,2020 WL 2404679 (D. Or. May12, 2020); *United States v. Hunt*, 2:18-cr-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020); *United States v. Ullings*,1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May12,

2020); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908

(D. Conn. May11, 2020); *United States v. Jenkins*, 99-cr-00439-JLK-1, 2020

WL 2466911 (D. Co. May 8, 2020); *United States v. Quintero*, 6:08-cr-06007-

DGL-1,2020 WL 2175171 (W.D. N.Y. May 6, 2020); *United States v. Howard*,

4:15-cr-00018-BR-2, 2020 WL 2200855 (E.D.N.C. May 6, 2020); *United States*

*v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1,

2020); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D.

Conn. May 1, 2020); *United States v.Delgado*, 3:18-cr-00017-VAB, 2020 WL

2464685 (D. Conn. Apr 30, 2020); *United Statesv. Dillard*, 1:15-cr-170-SAB,

Dkt. No. 71 (D. Idaho Apr. 27, 2020); *United Statesv. Joling*, 6:15-cr-00113-

AA-1, 2020 WL 1903280 (D. Or. Apr. 17, 2020); *United Statesv. Trent*, 3:16-

cr-00178-CRB-1,2020 WL 1812242 (N.D. Cal. Apr.9, 2020); *United States*

*v.Zukerman*, 1:16-cr-00194-AT-1,2020 WL 1659880 (S.D. N.Y. Apr. 3, 2020).

Also per Ms. Borunda's pro se motion for compassionate release, the

Government seems to have conceded that a BMI above 30 can warrant a

sentence reduction during the COVID-19 pandemic (DE 56-4).

    In addition to obesity, Ms. Borunda also cited her mental health as being

another risk factor placing her at a greater risk of severe illness with a COVID-

19 exposure (DE 56 pp 21-23).  She indicates she suffers from a major

depressive disorder (DE 56 p 23).  Her recent prison medical records

corroborate that she suffers from a recurrent major depressive disorder (Exh A pp 2, 20).  Her PSR also shows that she suffers from lifelong mental health issues associated with past trauma (DE 29 p 12).

The CDC has not identified mental health problems as an underlying medical condition that places COVID-19 positive people at an increased risk of severe illness or death.  However, the attached declaration of Paul Good, PhD, and Terry Kupers, MD, shows that the mentally unhealthy are at an increased risk of severe illness or death while incarcerated in prison due to exposure to COVID-19 (Exh B).  It shows that mentally unhealthy prisoners are especially susceptible to COVID-19 for multiple reasons (Exh B p 3-6).  The COVID-19 pandemic exacerbates stress levels in everyone but mentally unhealthy prisoners are less capable of withstanding the additional anxiety (Exh B p 4).  Such prisoners are more likely to think illogically, have disorganized thought processes, and experience delusions and hallucinations (Exh B p 6).  Such prisoners will likely have more difficulty following quarantine protocols and thereby place themselves and others at higher risk of infection (Exh B p 6).  The prison's containment (quarantine) protocols also exacerbate mentally unhealthy prisoners' mental health problems (Exh B pp 6-9).  Drs. Good and Kupers recommend reduction of the prison population to help alleviate these problems (Exh B p 11).  Ms. Borunda also cited three cases in her pro se motion for

compassionate release showing where other courts relied on mental health issues in concluding the existence of extraordinary and compelling circumstances during the COVID-19 pandemic (DE 56 pp 21-22).

Ms. Borunda submits that her obesity and major depressive disorder while she is incarcerated during the COVID-19 pandemic increase her risk of serious illness or death. The combination of multiple risk factors that increase risk coupled with exposure to COVID-19 and an inability to self-isolate and frequently hand-wash and use a toilet, sink, shower, phone, and computer that no one else is using make it difficult for Ms. Borunda to care for herself during the COVID-19 pandemic. She has thus demonstrated extraordinary and compelling circumstances under U.S.S.G. §1B1.13, note 1(A)(ii)(I) ("The defendant is suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.")

### 18 U.S.C. § 3553(a) Sentencing Factors

### Nature and Circumstances of the Offense

Ms. Borunda engaged in healthcare fraud and identity theft associated with the healthcare fraud (DE 29 pp 5-8). She was found responsible for a loss

of more than $225,000 (DE 29 p 8). The entirety of that amount is owed to the North Carolina Medicaid Program (DE 29 p 8). The victim of the identity theft did not suffer a financial loss (DE 29 p 8). According to her recent prison progress report, she has started paying on this restitution but still has a balance greater than $225,000.00 (Exh C p1). There was no evidence of the use of violence or coercion on Ms. Borunda's part. Ms. Borunda accepted responsibility for her crimes and expressed remorse (DE 29 p 8). Although these were serious offenses, Ms. Borunda appears to have taken her federal convictions seriously and her contrition appears to be legitimate as evidenced by her rehabilitation efforts described below.

<u>History and Characteristics of the Defendant</u>

Ms. Borunda suffered violent trauma as a young child (DE 29 p 11). She is the daughter of a military man and her family moved frequently but ultimately she and her siblings settled in North Carolina after coming of age (DE 29 p 11). She graduated from high school in Farmville, North Carolina in 2000 (DE 29 p 13). Although never married, she has three children, who are currently living with relatives (DE 29 pp 11-12; DE 56 p 36). Ms. Borunda's criminal history prior to the federal crimes consists of misdemeanor offenses only (DE 29 pp 9-10).

Ms. Borunda's compassionate release motion indicates she is employed in the prison kitchen as a cook (DE 56 pp 32-33). Her prison progress report confirms this (Exh C p 1). Her good performance in that job resulted in her recent promotion to lead cook (DE 56 pp 32-33).

Although she is not currently enrolled in any classes, she has completed many classes in the past (Exh C p 2). She attached certificates of completion to her pro se compassionate release motion confirming this (DE 56-7). She is on the waiting list for future classes (Exh C p 2). Her prison progress report indicates she has received one unspecified incident report since her last progress meeting (Exh C p 2). In her pro se compassionate release motion, she asserted that she has maintained "relatively good conduct" since her incarceration (DE 56 p 33). Ms. Borunda was on pretrial release for approximately a year before self-reporting to Alderson FPC in February 2019 (DE 56 p 35). She complied with all pretrial release conditions and timely reported to prison as required (DE 56 p 35).

Ms. Borunda's projected release date is in September 2021 (Exh D p 1). With credit dating back to February 2019, she has served more than 50% of full prison term (Exh D p 3). As she wrote in her compassionate release motion, she is not seeking to avoid the remainder of her prison term (DE 56 p 37). She is merely seeking to serve it in a safer environment (DE 56 p 37). The 19

months she has already served in prison is still significant enough to give her a greater appreciation for the seriousness of her offenses.

Ms. Borunda's release plan is to live with her brother in Goldsboro, North Carolina (DE 56 p 39). The brother lives with his girlfriend and her three children (DE 56 p 39). The children spend two weeks a month with their father in a separate home (DE 56 p 39). Ms. Borunda would have her own room, thus enabling her to better socially distance from others (DE 56 p 39). After Ms. Borunda moves in with her brother, her two sons will join her (DE 56 p 40). Ms. Borunda will home-school them while she simultaneously works from home for an apparel company (DE 56 p 40). She will perform bookkeeping, marketing, and other business-related duties (DE 56 p 40). In general, she will be exposed to fewer people and better able to maintain a more medically-safe environment than she can at FPC Alderson.

In sum, Ms. Borunda's history and characteristics show she is a nonviolent offender whose progress while in prison indicates she has a low likelihood of recidivism. She has a plan for reintegration back into the community. She is proposing to move into a supportive situation. The combination of her history and characteristics show she is unlikely to present a danger to the safety of other persons within the community.

<u>Needs of the Sentence to Reflect Seriousness, Deterrence, etc.</u>

Ms. Borunda received a 37-month prison sentence (DE 49 p 2).  She has served more than 50% of that sentence (Exhibit D p 3).  She is within a year of release without compassionate early release.  Her sentence was driven by the dollar amount associated with her crimes (DE 29 p 16).  She was ordered to pay a substantial amount of restitution (DE 49 p 7).  If released, she will be better able to pay down that amount of restitution.  While she fraudulently acquired a lot of money, Ms. Borunda submits that she has served enough of her sentence to appreciate the seriousness of her offenses.  She has been removed from her community and her children for nearly two years.  Given her health problems, the current state of the COVID-19 pandemic, and the risk it poses to people living in close proximity to one another, it is unlikely Ms. Borunda's ongoing health, educational, and vocational needs are being adequately met in the prison environment.  They could be achieved just as effectively if not more so in a community setting outside of prison where she can better self-care.  She will have better ability to socially distance from others, frequently wash her hands, prepare her own meals, use a bathroom used by only a few others, take walks outdoors in fresh air, and socialize with people that truly care for her.  Ms. Borunda submits that the sentence she has already served more than adequately

reflects the seriousness of her offenses and has provided just punishment for her crimes.

Kinds of Sentences Available

Ms. Borunda was required to serve a two-year prison sentence on the identity theft and she was in Zone D of the Sentencing Chart for the other offense when originally sentenced (DE 29 pp 16-17). Zone D also requires a prison sentence followed by supervised release. The identity theft sentence must run consecutive to the other sentence (DE 29 pp 16-17).

However, the Court can now reduce a term of imprisonment via compassionate release or "impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment[.]" 18 U.S.C. § 3582(c)(1)(A). The Court can also convert a portion of the supervised released term to home confinement if the Court believes additional confinement punishment is necessary. *See id*. The Court has the authority to reduce the term of imprisonment, not just release Ms. Borunda outright. *Id*. Theoretically, the Court could convert the remainder of Ms. Borunda's sentence to probation. Ms. Borunda submits that a sentence reduction would be consistent with the sentencing guidelines.

Conclusion

Ms. Borunda respectfully asks the Court to order a sentence reduction to time served and/or that the remainder of her prison sentence be served while on probation or post release supervision.

Respectfully submitted this 28th day of October, 2020.

/s/ Richard Croutharmel
Richard Croutharmel
Attorney for Defendant
5 West Hargett Street, Suite 706
Raleigh, NC 27601
Telephone: 919-755-1113
Fax: 919-755-1162
Email: rcroutharmel@earthlink.net
NC Bar No. 29165

## CERTIFICATE OF SERVICE

I certify that I filed and served the foregoing **MEMORANDUM IN SUPPORT OF PRO SE MOTION FOR COMPASSIONATE RELEASE** electronically with Clerk of Court for the United States District Court for the Eastern District of North Carolina using the CM/ECF system which will send notice of such filing to the following registered CM/ECF users: Joshua Royster, Assistant United States Attorney.

This 28th day of October, 2020.

/s/ Richard Croutharmel
Richard Croutharmel
Attorney for Defendant
5 West Hargett Street, Suite 706
Raleigh, NC 27601
Telephone: 919-755-1113
Fax: 919-755-1162
Email: rcroutharmel@earthlink.net
NC Bar No. 29165